UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY SIDES,            : CIVIL NO: 1:CV-04-1349
                               :
            Plaintiff     :
                               :
        v.                :
                               : (Magistrate Judge Smyser)
JEFFREY BEARD and       :
TERESA LAW,            :
                               :
            Defendants   :

**<u>MEMORANDUM</u>**

I. Background and Procedural History.

On June 23, 2004, the plaintiff, a prisoner, commenced this action by filing a complaint. At the time he commended this action that plaintiff was proceeding *pro se.* However, counsel subsequently entered an appearance on behalf of the plaintiff. On April 28, 2006, the plaintiff filed a fifth amended complaint.

The plaintiff voluntarily dismissed a number of his claims. The only remaining claim is an Eighth Amendment claim against defendants Jeffrey Beard, the Secretary of the Pennsylvania Department of Corrections, and Teresa Law, the Chief Health Care Administrator for the State Correctional Institution

at Camp Hill (SCI-Camp Hill).  The claim is based on an alleged denial of mental health treatment for the plaintiff while he has been housed in the Special Management Unit (SMU) at SCI-Camp Hill.  The claim is brought against defendants Beard and Law in their official capacities for declaratory and injunctive relief. The plaintiff seeks a declaration that he has a mental health condition that is a serious medical need, that he has not received adequate treatment of his medical need, that his placement in the SMU makes his mental health condition worse, and that as long as he is in the SMU he will not be able to receive appropriate treatment for his serious medical need.  The plaintiff also seeks an injunction ordering the defendants to transfer him to a correctional institution or other SCI-Camp Hill unit appropriate for his mental health needs.  In addition, the plaintiff seeks attorney's fees and costs and any additional relief that the court deems just, proper and equitable.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c).  By Order of October 17, 2006, the defendants' motion for a summary judgment was denied and a trial was scheduled on the plaintiff's claims for declaratory and injunctive relief.  The trial was held on November 8, 2006.  A summary of the trial testimony follows.

II.   Trial Testimony.

The plaintiff called two witnesses.  Dr. John Hume stated that he is a physician and a psychiatrist and has practiced psychiatry for over forty years.  He examined Sides' medical records and personally examined Sides and concluded that Sides has bipolar disorder, a mental disorder.  He based his opinion upon Sides' history of periods of reasonable control separated by episodes of bizarre, aggressive, acting out, self-destructive behavior, sometimes involving hallucinations.  He referred to multiple suicide attempts, self-mutilation and smearing of feces. Sides' relative normalcy during lengthier periods interrupted by short either manic or depressive episodes is symptomatic of bipolar disorder.

Dr. Hume also has the opinion that Sides has not received treatment for his bipolar disorder while in the SMU at Camp Hill. The ideal treatment for bipolar disorder is a combination of medication and therapy.

Dr. Hume also stated the opinion that Sides has anti-social personality disorder and has not received medication and other appropriate treatment for that disorder in the SMU.

3

Dr. Hume stated that, in his opinion, Sides' confinement in the SMU exacerbates his mental health conditions.  Dr. Hume testified that the lack of medication to control his hallucinations and his paranoia increases his problems, causing him to get in more trouble and to get more disciplinary time. Dr. Hume stated that the conditions in the SMU may aggravate an organic brain syndrome in the plaintiff.  Dr. Hume testified that 23 of 24 hours in his cell, the absence of television or reading materials, noise, and a lack of an opportunity for confidential communications to staff, all can contribute to psychotic symptoms.

Dr. Hume stated that although Sides was diagnosed with Axis I disorders in other correctional facilities, he has not been so diagnosed at Camp Hill.  He acknowledged that a bipolar disorder diagnosis is problematic and that a person with bipolar disorder may not be correctly diagnosed for a long time, perhaps not for an average of eleven years according to one study.  He stated that in correctional institutions, aggressive behavior is commonly seen as a part of a personality disorder.  He stated that when bipolar disorder appears to be a probable diagnosis, a

4

trial on medication is appropriate and may confirm the probable diagnosis.

He cited a January 7, 2003 report containing a description of Sides that was consistent with a person involved in a manic episode.  Hume stated that a October 14, 2005 assessment was consistent with a person in the depressed phase of bipolar disorder and that in a 1999 Norristown State Hospital discharge summary, a diagnosis of dysthemic disorder, an Axis II disorder, would have been consistent with a bipolar disorder.

Hume stated that an April, 2000 SCI-Greene diagnosis of anti-social manic depression was consistent with a bipolar disorder diagnosis.  He noted that a January 19, 2001 individual treatment plan for Sides also diagnosed an Axis I disorder.

Hume considered a January 2006 diagnosis of Sides by Dr. Eugene Polmueller, and stated his opinion that Dr. Polmueller's diagnosis was not reliable.

Hume stated that psychotherapy, specifically cognitive behavioral therapy, is helpful for a bipolar disorder patient, helping the patient to correct misperceptions about himself and

5

his environment.  Hume stated that Sides has not received meaningful psychotherapy.

Hume noted that Sides' contacts with department psychologists have occurred with frequency during periods when there has been acting out and aggressive behavior or self-harmful behavior on Sides' part and that, otherwise, Sides has had little significant contact with psychologists.  Hume stated that contact with psychologists at times of manic extremes is not helpful, but that regular and continuous psychological counseling would be helpful.  Hume also stated that the periodic incidents of acting out behavior on Sides' part is characteristic of bipolar disorder.  Hume thinks that the SCI-Waymart forensic treatment center would be an appropriate confinement location for Sides. Hume testified that a secure special needs unit would also be a more appropriate place of confinement for Sides than the SMU.

On cross-examination, Dr. Hume stated that he had worked at SCI-Camp Hill in 1990, and that he was asked not to return to his former employment at SCI-Camp Hill after an inmate had died.

He acknowledged that Sides had a detailed memory of his hospitalizations and medications, over the years, from childhood.

He believes that Sides knows the difference between right and wrong, but he felt in his evaluation of Sides for the Cumberland County Court that Sides could not assist in his own defense.  He acknowledged that his examination of Sides was of a very limited nature, a two hour conversation with Sides.  Documents prepared by Sides in the present civil litigation suggest to Dr. Hume that Sides might have been better able to assist in his own defense than Dr. Hume had thought when at the request of Cumberland County he had evaluated Sides and had reported that Sides was incompetent to stand trial.

Dr. Hume stated that reasonable psychiatrists could disagree about the diagnosis in Sides' case; in particular, about whether he has an Axis I disorder.  He also stated that reasonable psychiatrists could also disagree about the correct treatment for Sides.  He stated that it is easy to fail to make a bipolar disorder diagnosis in a person who in fact has bipolar disorder.  Hume noted that there is not one single objective test for bipolar disorder.

Although bipolar disorder was not diagnosed at SCI-Waymart when Sides was evaluated there, Hume believes based upon

the descriptions of his behavior that a bipolar disorder diagnosis would have been correct.

Hume stated that in his experience prisoners often misrepresent things in order to get help.  When Hume met with Sides, he was told by Sides that Sides had a history of manic depression, and Hume believed that.

Hume stated that anti-social personality disorder is also treatable with medication and psychotherapy, and that the SMU environment does not provide a beneficial setting for that disorder.

Anthony Sides, the plaintiff, testified as follows.  He has been in the SMU since July 23, 2003.  He will reach his maximum sentence release date on March 30, 2009.  Before he was in state prison, he was hospitalized many times, for drug dependency treatment and mental health treatment.  He was receiving treatment for anti-social personality disorder, manic depression, intermittent explosive disorder and other disorders.

He stated that he had been in four or five restricted housing units, for a total of about two years.  He had been in general population, in the special needs unit, for six to nine months.  He had visits from psychologists and psychiatrists in the restricted housing units, and had access to one-on-one therapy and had medications.

Sides stated that there is no medication provided to prisoners in the SMU.  The only contact with a psychologist is at the Program Review Committee (PRC) monthly review meetings.  There is "really no mental health treatment at the SMU."  The PRC meetings are brief, two to three minutes.  Present at a PRC meeting is the unit manager, the counselor, a deputy superintendent, someone from administration and the psychologist.  Apart from the monthly PRC meeting, when a psychologist meets with a prisoner, the psychologist stands outside the prisoner's cell door.  Due to this meeting format, there is no confidentiality in a prisoner's communication to a psychologist.  Sides has seen psychologists while in the SMU only when he has acted out (heard voices, smeared feces, mutilated himself or destroyed property).  Sides has tried to commit suicide countless times while in the SMU.  Sides does not regularly see a psychologist; he is not on the mental health roster.  He sees a

psychologist only when he acts out.  When he does have contact with a psychologist, it is a brief five minute meeting.

When Sides went to SCI-Waymart for evaluation, he was placed on medication (Zoloft), which was discontinued when he was returned to the SMU.

Sides can not explain his passages into acting out behavior.  Sides describes the SMU atmosphere as isolated, with deprivations of publications and of hygiene items.  There is banging, yelling, screaming, arguing and flooding of the tiers.

Sides believes that the lack of treatment of his mental condition during his SMU confinement has harmed him.  He feels that his brain is deteriorating.

On cross-examination, Sides stated that there are times that he does not always tell the truth.  Sides stated that he probably has around 91 misconducts on record while incarcerated. Sides stated that he considers there to be a difference between meeting with a psychologist and receiving psychiatric treatment.

The defendants called two witnesses.  Robert John Marsh,
Jr., the corrections classification manager at SCI-Camp Hill,
testified as follows.  He explained that the SMU is the DOC
statewide maximum security housing unit.   It is for disruptive
inmates who are disruptive even in an RHU.   There is a full-time
psychologist assigned to the SMU.  An inmate has a mental health
review before his is sent to the SMU.   The SMU is not considered
to be an appropriate placement for a prisoner with a comorbid
mental health diagnosis.  There are about 55 to 60 SMU prisoners.
These are disruptive inmates, inmates who are a threat to staff
and inmates who are in continual conflict with authority figures,
with prisoner procedures and with prison policies.  Prisoners are
given the opportunity in the SMU to modify their behavior and to
work towards an accelerated general population placement, by
fulfilling particular staff expectations.

SMU programming is to give inmates a monthly PRC meeting
where the inmate is given feedback about his behavior.  The
inmate is told the things he can do to work towards general
population placement.  Also, counselors speak to inmates at the
cell door once or twice a week.  The psychologist also see the
inmates, trying to create motivation in the inmate to change.  A
psychologist is on the unit 40 hours a week.  Correctional

11

officers make rounds and go to inmate cell doors.  Chaplains make rounds.  Inmates can request to see the psychologist.

Inmates in the SMU can communicate with other inmates in various ways.  They can sign up for sick call.  There are more staff persons on the SMU than would be present in an RHU.

Sides was placed in the SMU because he had accumulated a very great amount of disciplinary custody time.  He had been disruptive in the SCI-Huntingdon RHU.  He motivated other prisoners to be disruptive.  He was sent to the SMU to have the opportunity to have disciplinary time deducted and to move back to general population.

Sides' mental health diagnosis is anti-social personality disorder.  Inmates with anti-social personality disorder may be placed in the SMU.  Marsh described the process for referral of a prisoner to the SMU.  The process includes a review of the inmate's suitability for SMU placement from a psychiatric perspective.  Factors considered in determining whether to place an inmate in the SMU include whether there is an Axis I diagnosis.  After SMU placement, the inmate is given short-term goals and told what steps will return the inmate to the general

population.  Marsh stated that prison management is uniquely qualified to make decisions about placements in the SMU because prison management does not want to intermingle high risk people and wants to keep inmates where they are going to be safe and secure.

Sides is a phase 5 maximum security SMU inmate because of "his past demonstrated behavior, his unwillingness to comply with rules and regulations of the Department of Corrections" and because "he hasn't made a motivated concerted effort to improve his situation by participating in programming."  Doc. 372, page 163.  The psychiatric review team can recommend SMU and disciplinary time reductions if the prisoner shows that he deserves time reductions.

Sides was sent to SCI-Waymart for an evaluation in the special assessment unit.  Marsh voted against that transfer, because Marsh felt that Sides presented a behavior issue and not behavior arising from a mental disease.  The SCI-Waymart SAU assessment was that there was no Axis I disorder and was no mental health contraindication to continuing Sides in the SMU program.

13

Since his reception in the DOC, Sides has incurred 72 reports of misconduct and 9,620 days of disciplinary custody time.  1,035 days of his DC time result from assaultive behavior. If he had gone to or remained in an RHU, all of his remaining sentence would be spent in an RHU.  Given SMU procedures and rules, he can work his way back to general population.

Marsh characterized Sides' behavior in the SMU as calculating, as "thinking two and three steps ahead," and as adversarial rather than collaborative.

After Sides returned to the SMU from his SCI-Waymart SAU assessment, he wanted to be given psychotropic medication.  The determination was made not to prescribe psychotropic medication for him.

Eugene Francis Polmueller, the Director of Psychiatry for MHM Corrections, testified as follows.  He is a psychiatrist who has worked in private practice from 1992 to 1999 and in corrections from 1999 to present.  MHM Corrections contractually provides mental health services for Pennsylvania correctional institutions.  Dr. Polmueller is the supervising psychiatrist for SCI-Camp Hill, along with other statewide duties.  He has worked

14

with Sides, while Sides was at SCI-Huntingdon, SCI-Smithfield, and presently at SCI-Camp Hill.  At SCI-Huntingdon, Polmueller observed discrepancies between the diagnosis of Sides at that time as suffering bipolar disorder and Sides' observable behavior at SCI-Huntingdon.  The diagnosis was changed to anti-social personality disorder.  The criteria for a diagnosis of anti-social personality disorder were reviewed by Dr. Polmueller in his testimony.  Applying those, Dr. Polmueller had diagnosed anti-social personality disorder in Sides.  Dr. Polmueller explained that as an inmate entering the DOC, Sides was stated to be manic depressive based upon information supplied by the county of commitment and by Sides' own report(s).  Since Sides' reception, no diagnosis of bipolar disorder has been made, according to Polmueller.  Anti-social personality disorder does not preclude an inmate from SMU placement.  Most SMU prisoners have anti-social personality disorder, according to Polmueller.

In the Department of Correction, diagnosis and treatment decisions for serious mental illness are made by the psychiatrist for purposes of medication management, treatment and hospitalization.  Dr. Polmueller considers SMU placement to be a more benign option for Sides than is warranted by his behavior.

Polmueller stated that psychiatric and psychological treatment for anti-social personality disorder will not potentially be fruitful for a person unless the person considers treatment to be a positive thing and cooperates.  Sides does not fulfill these prerequisites.

Polmueller did not place Sides on psychotropic medication because Polmueller does not believe that Sides' diagnosis warrants the use of such medicine.  Polmueller did not observe in Sides consistent symptomotology that would meet the DSM-4 criteria for serious Axis I mental illness.  Sides' manner throughout Polmueller's familiarity with him was to loudly proclaim that he has a mental illness and to demand accommodations, but not to cooperate by communicating and by accepting treatment.  Sides in the observation of Polmueller never showed the motivation, insight and interest appropriate to justify psychotherapy and psychotropic medication management. Polmueller does not support SMU placement for Sides, either, since Polmueller does not think that Sides has the required motivation to work his way to general population.  Polmueller would not recommend Sides for placement in the Department's forensic treatment center, either, since Sides has been seen by

Polmueller to be very hard on psychiatrically ill fellow prisoners, taunting and harassing them.

Polmueller stated that Sides' MMPI-2 test results indicated exaggeration by Sides.  Sides' discharge from SCI-Waymart's SAU was with an assessment that bipolar disorder was not a present disorder.  Sides had been taking Zoloft, an antidepressant, at Waymart.  He was not continued on Zoloft upon his return to the SCI-Camp Hill SMU.  Polmueller believes that medications are not useful for the direct treatment of anti-social personality disorder.

Polmueller stated that the Norristown State Hospital diagnosis for Sides from October of 1999 included an Axis I diagnosis of dysthymia.

Polmueller affirmed that when he evaluated and diagnosed Sides in the course of Sides' confinement, Polmueller exercised his professional judgment.

III. Discussion.

In order for the plaintiff to establish an Eighth Amendment medical claim he must establish that the defendants

17

acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976).

The concept of serious medical need has two components, one relating to the consequences of a failure to treat and the other relating to the obviousness of those consequences. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).  The condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury or death. *Id*.  Also, the condition must be one that has been diagnosed by a doctor as requiring treatment or one that is so obvious that a lay person would easily recognize the need for a doctor's attention. *Id*.

Mere medical malpractice does not give rise to a violation of the Eighth Amendment.  *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990).  "While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).  The Third Circuit has "found 'deliberate indifference' in a variety of circumstances,

18

including where the prison official (1) knows of a prisoner's
need for medical treatment but intentionally refuses to provide
it; (2) delays necessary medical treatment based on a non-medical
reason; or (3) prevents a prisoner from receiving needed or
recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192,
197 (3d Cir. 1999).  The Third Circuit has also "found
'deliberate indifference' to exist when the prison official
persists in a particular course of treatment 'in the face of
resultant pain and risk of permanent injury.'" *Id*. (quoting *White
v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)).

Prison medical authorities are given considerable
latitude in the diagnosis and treatment of medical problems of
inmates and courts will "disavow any attempt to second guess the
propriety or adequacy of a particular course of treatment . . .
which remains a question of sound professional judgment." *Little
v. Lycoming County*, 912 F.Supp. 809, 815 (M.D.Pa. 1996)(quoting
*Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d
Cir. 1979)).  Mere disagreement as to the proper medical
treatment does not support an Eighth Amendment claim. *Monmouth
County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d
326, 346 (3d Cir. 1987)("Courts, determining what constitutes
deliberate indifference, have consistently held that mere

19

allegations of malpractice do not raise issues of constitutional

import. . . . Nor does mere disagreement as to the proper medical

treatment support a claim of an eighth amendment violation."); 

*White*, *supra,* 897 F.2d at 110 (mere disagreement over proper

treatment does not state a claim upon which relief can be

granted).

Although the plaintiff admits that he has had numerous

contacts with mental health staff while in the SMU, his

contention is that those contacts were superficial and do not

amount to treatment.

As prison administrators, the defendants have the

requisite control to have provided the relief that Sides is

asking for; in particular, to cause him to be removed from the

SMU and to direct that he be provided appropriate care for his

mental health condition.

The plaintiff asks for the court to enter a declaratory

order declaring that he has serious medical needs relating to his

mental health condition and that he is not receiving treatment

for those serious medical needs, and declaring that his placement

in a special management unit exacerbates his mental heath

20

condition so as to constitute psychological torture.  He asks the court to order that he be placed in another prison unit.

There is no dispute that Sides has anti-social personality disorder.  Sides asks the court to find as a fact that Sides suffers from bipolar disorder, a serious medical need. The evidentiary basis that supports the finding, Sides contends, is the report (Exhibit J-122) and the testimony of Dr. Hume.  Dr. Hume, although he has stated that "[t]he record is replete with clinical observations strongly suggesting Bipolar Affective Disorder, mixed type," has testified that reasonable mental health professionals could disagree as to a patient's correct diagnosis and as to whether a bipolar disorder diagnosis of a patient is a correct diagnosis.

It is not in dispute that the special management unit is not appropriate for Sides if he has bipolar disorder.  From the defendants' evidence, we have a history throughout Sides' incarceration of diagnostic efforts and a history of diagnoses of anti-social personality disorder.

Dr. Hume's diagnostic impression may be considered not to be adequately grounded in data to be deemed more reliable than

the diagnoses of Department of Corrections psychiatrists.  Hume himself emphasized the necessity of a long-term tracking of the patient to arrive at a reliable bipolar disorder diagnosis.  His time with Sides was very limited.  On the other hand, Dr. Polmueller's and other correctional mental health professionals' opinions could be considered to be unduly grounded in prison security and prison managerial concerns to be reliable.

Dr. Hume acknowledged the possibility of professional disagreement among reasonable professionals as to the correct diagnosis.  There has also been disagreement within the ranks of correctional mental health professionals over the propriety of SMU placement.  Dr. Polmueller does not rule out psychotherapy and psychotropic medications for Sides if Sides were to adopt a therapeutically receptive philosophy.  We will not purport to declare there to be a right and wrong diagnosis or a right and wrong mode of treatment here, since to do so would require us to make a mental health diagnostic finding that we can not reliably make and one that we accordingly should not make if, in the absence of such a finding, we can decide whether there is deliberate indifference to serious medical needs.

22

The record shows that, in the past, Department of Correction medical staff personnel have decided that Sides does not have bipolar disorder.  The historical determinations that he does not have bipolar disorder constitute the opinion of the Department of Correction that he does not have bipolar disorder. Dr. Polmueller explained these past determinations in his testimony.

Of greater significance for purposes of this adjudication, in the fact of the efforts to properly diagnose the causes for Sides' behavior, both for purposes of affording appropriate treatment to Sides and for the purpose of reducing Sides' disruptive behavior, there is evidence that there has not been deliberate indifference to Sides' mental health needs. Sides argues that in the absence of a determination by the defendants that Sides has bipolar disorder, there is deliberate indifference to his condition.  We do not agree.  We find, in the end analysis, that this is a case of disagreement over the proper diagnosis and treatment, not a case of deliberate indifference.

The plaintiff has not carried the burden of proving that there is deliberate indifference to his serious medical needs. He has not proven what his serious medical needs are, and he has

23

not proven that the Department of Corrections' mental health diagnostic and treatment approach and efforts are indifferent, have been indifferent or will be indifferent.

IV. Findings of Fact.

The following are the material findings of fact of the court:

1.)  The plaintiff, Anthony W. Sides, has anti-social personality disorder.

2.)  Anti-social personality disorder is prevalent among prisoners.  It is to a great extent not amenable to treatment, in that persons who have this disorder usually do not cooperate in a therapeutic treatment program.

3.)  Sides is in the SCI-Camp Hill Special Management Unit (SMU).  He has committed many misconducts.  If he were to cooperate with the SMU programmatic approach, he could be returned to the general population.

4.)  His maximum release date is in 2009.

5.)  Although a reasonable and competent mental health professional has diagnosed bipolar disorder, the mental health service professionals for the Department of Correction have reasonably determined that Sides does not suffer from bipolar disorder.

6.)  Although the SMU would not be appropriate if Sides has bipolar disorder, it is not an inappropriate program for Sides on that basis in the defendants' judgment because Department of Corrections mental health professionals do not believe that Sides has bipolar disorder.

7.)  The defendants reasonably believe that Sides is appropriately placed in the SMU.

8.)  The defendants reasonably believe that Sides has the opportunity to receive adequate mental health treatment.

9.)  The defendants have not been indifferent to affording adequate mental health treatment to Sides.

V. Conclusions of Law.


      1.   The defendants have not been indifferent to the plaintiff's mental health needs.


      2.   The defendants have not been deliberately indifferent to the plaintiff's serious medical needs.


      3.   The defendants have not violated the plaintiff's Eighth Amendment rights.


      4.   The defendants are entitled to the entry of judgment in their favor.


                            ***/s/ J. Andrew Smyser***
                            J. Andrew Smyser
                            Magistrate Judge

Dated:  December 1, 2006.